1  KIMBERLY DONOVAN (160729)
   **GCA LAW PARTNERS, LLP**
2  1891 Landings Drive
   Mountain View, Ca 94043
3  Telephone: (650) 237-7294
   Facsimile: (650) 428-3901
4  E-mail: kdonovan@gcalaw.com

5

6  H. DICKSON BURTON (4004) (*pro hac vice*)
   EDGAR R. CATAXINOS (7162) (*pro hac vice*)
   **TRASKBRITT, P.C.**
7  230 South 500 East
   Suite 300
8  P.O. Box 2550
   Salt Lake City, Utah 84110-2550
9  Telephone:    (801) 532-1922
   Facsimile:    (801) 531-9168
10 E-Mail:    hdburton@traskbritt.com

11 Attorneys for Defendant
   STORAGECRAFT TECHNOLOGY CORP.
12

13            IN THE UNITED STATES DISTRICT COURT

14        FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                 SAN JOSE DIVISION

16

17 SYMANTEC CORP.                    )  Case No.  CV07-4731 JW
                                     )
18              Plaintiff,           )     **DECLARATION OF**
                                     )  **CHRISTOPHER J. MARTINEZ IN**
19      v.                           )   **SUPPORT OF MOTION FOR**
                                     )    **PROTECTIVE ORDER RE:**
20 STORAGECRAFT TECHNOLOGY          )   **SUBPOENA TO BURBIDGE,**
   CORPORATION.                      )    **MITCHELL & GROSS**
21              Defendant            )
                                     )
22                                   )  Date:    March 17, 2008
                                     )  Time:    9:00 a.m.
23                                   )  Place:   Courtroom 8
                                     )  Judge:   Honorable James Ware
24                                   )
                                     )
25                                   )
                                     )
26 _____  )

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

I, Chris Martinez, hereby declare as follows:

1.    I am a resident of the State of Utah, am over the age of eighteen years, and have personal knowledge of all facts set forth herein. I am an associate with the law firm of Snell & Wilmer's Salt Lake City office and am counsel of record for the defendants in the matter of *NetJapan Holdings, Inc., et al. v. StorageCraft Technology Corporation, et al.*, (the "NetJapan Action") pending in the Third Judicial District Court for Salt Lake County, State of Utah. I would and could competently testify to these facts if called upon to do so in a court of law.

2.    On December 14, 2006 Plaintiffs NetJapan Holdings, Inc. and NetJapan, Inc. ("NetJapan") filed a Complaint against StorageCraft Technology Corporation and certain of its officers and directors ("STC"). A true and correct copy of this Complaint is attached as Exhibit A. In August 2007 NetJapan filed an Amended Complaint in the NetJapan Action. Since the Amended Complaint was filed under seal, I have not attached it to this declaration. However, the general subject matter of the allegations remains the same as those asserted in the initial complaint which is attached hereto as Exhibit A.

3.    NetJapan is one of STC's Japanese distributors. STC and NetJapan entered into a Master Distributor Agreement that memorializes the terms of this relationship. The agreement concerns the distribution of StorageCraft's software products in Japan.

4.    In addition, NetJapan is a shareholder of STC, and STC and NetJapan entered into a Stock Purchase Agreement that memorializes the terms of the NetJapan purchase of STC's shares.

5.    STC and NetJapan also entered into an Advanced Royalty Agreement pursuant to which NetJapan advanced $300,000 to STC.

6.    NetJapan has asserted a number of claims against STC related to NetJapan's decision to invest in STC and claims related to its role as a shareholder of STC. Both NetJapan and STC have asserted various claims against each other for breach of their distribution agreement (as well as other agreements entered into by them).

7.    At the beginning of this case, to safeguard the confidential information that would be disclosed by both parties through discovery, the parties entered into a stipulated Protective Order.  A true and correct copy of the stipulated Protective Order is attached as Exhibit B.

8.    The discovery in this case has been voluminous.  STC has produced about 100,000 documents to NetJapan.  Nearly all of these documents have been designated as "confidential" or "highly confidential" under the Court's protective order.

9.    These documents can be broadly broken down into the following categories of documents:

    a)    Communications with NetJapan concerning its investment in STC and distribution of STC's products in Japan;

    b)    Internal financial information including the companies complete general ledger for certain time periods, billing and payment information, vendor information, corporate tax returns and related materials; financial statements; revenue projections; and detailed sales data;

    c)    Substantial volumes of information concerning STC's marketing, business plan, and strategy;

    d)    Business plans, projections, and related communications;

    e)    Communications with STC's distributors, resellers, and customers;

    f)    Internal product development information and communications, including portions of the source code for STC's software products;

    g)    Agreements with STC distributors and customers (some of which contain express confidentiality clauses).

10.    In addition, NetJapan has taken 17 depositions, including depositions of STC officers and employees, STC's customers and distributors, and a former officer and employee of

1    STC. The testimony elicited during these depositions fall within the same categories of

2    information described above. A large portion of the testimony elicited in these depositions has

3    been designated as either "confidential" or "highly confidential" under the Court's Protective

4    Order.

5        11.    Indeed, almost all the discovery produced by STC has been designated as

6    "confidential." A small, but significant, percentage of the documents produced by STC and its

7    deposition testimony has been designated as "highly confidential." The highly confidential

8    information includes some of STC's product development information and portions of source

9

10   code along with business relationships and related communications that are particularly sensitive.

11       12.    The overwhelming majority of the information described above does

12   not even mention Symantec (or its predecessor, PowerQuest) or either companies' software

13   products.

14

15       13.    Finally, both parties have filed numerous documents with the court under seal.

16   Indeed, more than fifty filings with the court were filed under seal.

17       14.    The terms of the Stipulated Protective Order do not address the circumstance of a

18   third party issuing a subpoena to obtain documents and materials produced by either party as

19   "confidential" or "highly confidential."

20       I hereby declare under penalty of perjury that the foregoing is true and correct.

21       DATED this 18th day of January, 2008.

22

23

24                                          CHRIS MARTINEZ

25

26

27

28

# EXHIBIT A

FILED DISTRICT COURT
Third Judicial District

DEC 1 4 2006

SALT LAKE COUNTY

By_____
                    Deputy Clerk

Richard D. Burbidge (#0492)
Jefferson W. Gross (#8339)
Robert J. Shelby (#8319)
BURBIDGE & MITCHELL
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: (801) 355-6677
Facsimile: (801) 355-2341

**ORIGINAL**

Attorneys for Plaintiff

## IN THE THIRD JUDICIAL DISTRICT COURT

## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| NETJAPAN HOLDINGS, INC., a Japanese Corporation; and NETJAPAN, INC., a Japanese Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> STORAGECRAFT TECHNOLOGY CORPORATION, a Utah Corporation; THOMAS J. SHREEVE, an individual; THOMAS R. SHREEVE, an individual; SCOTT A. BARNES, an individual; CURTIS A. JAMES, an individual; BRANDON NORDQUIST, an individual; and DOES I THROUGH V, <br><br> Defendants. | **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Civil No. 060920091 <br><br> Judge: Hilder |

Plaintiffs allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff NetJapan Holdings, Inc. ("NJH"), is a Japanese corporation having its

principal place of business in Tokyo, Japan.

2.      Plaintiff NetJapan, Inc. ("NetJapan"), is a Japanese corporation having its principal place of business in Tokyo, Japan. NetJapan is a wholly owned subsidiary of NJH.

3.      Defendant StorageCraft Technology Corporation ("STC") is a Utah corporation having its principal place of business in Salt Lake County, State of Utah. STC is the successor entity following the merger of ShadowStor, Inc. ("ShadowStor"), a Utah corporation and StorageCraft, Inc. ("SCI"), a California corporation.

4.      Defendant Thomas J. Shreeve ("J. Shreeve") is an individual residing in Salt Lake County, State of Utah.

5.      Defendant Thomas R. Shreeve ("R. Shreeve") is an individual residing in Salt Lake County, State of Utah.

6.      Defendant Brandon Nordquist ("Nordquist") is an individual residing in Davis County, State of Utah.

7.      Defendant Scott Barnes ("Barnes") is an individual residing in Utah County, State of Utah.

8.      Defendant Curtis James ("James") is an individual residing in Utah County, State of Utah.

9.      At all times relevant herein, Defendants J. Shreeve, R. Shreeve, Nordquist, Barnes, and James (the "Individual Defendants") have been officers, directors and shareholders of STC.

2

## FACTUAL ALLEGATIONS

10.    This Court has jurisdiction of this action as the contracts which are the subject of this action were entered into in the State of Utah and the tortious conduct complained of herein occurred in Salt Lake County, State of Utah. Further, venue is proper in this forum pursuant to Utah Code Sections 78-13-4, 78-13-5 and 78-13-7.

11.    NetJapan is a distributor of computer software in Japan. As part of its business, NetJapan regularly modifies software designed to operate in the English language so that it may be used and employed in the Japanese language. NetJapan's customers include major corporations, original equipment manufacturers and distributors of software for retail sale in Japan.

12.    ShadowStor was formed in or around 2003 by former employees of PowerQuest, a company which sold back-up software. When another software company, Symantec, acquired PowerQuest, Defendants Barnes, R. Shreeve, Nordquist and James terminated their employment with PowerQuest and, along with Defendant J. Shreeve, formed ShadowStor. Notwithstanding the termination of their employment with PowerQuest, Defendants R. Shreeve, Barnes, Nordquist and James remained obligated under written agreements not to compete with PowerQuest/Symantec and not to use confidential information obtained through their employment with PowerQuest.

13.    On March 10, 2004, Defendant James contacted NetJapan to promote software being developed by ShadowStor.

14.    On May 13, 2004, representatives of NetJapan met with Defendants J. Shreeve, R. Shreeve, Barnes and James. At this meeting, NetJapan discussed its need for software to substitute for Symantec's V2i protector software. At this meeting, ShadowStor advised NetJapan of its plans to develop a product similar to V2i protector called "Shadowback."

15.    On June 1, 2004, ShadowStor and NetJapan entered into a written agreement entitled ShadowStor Master Distributor Agreement (the "Distributor Agreement"), a true and correct copy of which is attached hereto as Exhibit "1" and incorporated herein as if set forth in full. Among other things, the Distributor Agreement granted NetJapan the non-exclusive rights to market, to promote and to sell computer software developed by ShadowStor in Japan.

16.    On July 1, 2004, Defendant J. Shreeve, on behalf of ShadowStor requested that NetJapan help finance "the development cost for a V2i protector-like product." In particular, ShadowStor requested that NetJapan loan ShadowStor $150,000.00 so that ShadowStor could complete and release the Shadowback software and so that NetJapan could release the product in Japan in early December 2004.

17.    In response to ShadowStor's request for a loan, NetJapan advised Defendant J. Shreeve that NetJapan was not interested in loaning money but would consider an equity investment if ShadowStor and SCI were merged into one company.

4

18.    On August 6, 2004 and prior to STC's formation, Defendant J. Shreeve solicited a purchase of STC's shares of stock by NetJapan. In particular, Defendant J. Shreeve proposed that NetJapan acquire a ten percent (10%) equity interest in the combined SCI/ShadowStor entity, i.e., the entity which would become STC. Defendant J. Shreeve represented to NetJapan a value of the combined entity in the range of $12 million to $15 million. In order to substantiate this excessive and inflated valuation, Defendant J. Shreeve provided pro forma projections on financial performance which the Individual Defendants knew could not be met. In particular, the Individual Defendants represented that a reasonable forecast for revenues in year one of operations was $1.7 million (not including any projected revenue from NetJapan). In order to support and give credence to these projections and on August 10, 2004, Defendant J. Shreeve provided to NetJapan and NJH a table entitled "OEM Sales Pipeline." In this table, the Individual Defendants made projections on the closings of specific customers with projected revenues which projections were designed to induce NetJapan and NJH to believe that projected revenue would be forthcoming. Indeed, the Individual Defendants represented to NetJapan and NJH that the "conservative case" for revenue in year one was $1,275,000.00. Notably, Defendant J. Shreeve did not provide NetJapan or NJH with actual financial statements from SCI and ShadowStor.

19.    The projections and representations about anticipated future revenue by the combined entity of SCI and ShadowStor were known by the Individual Defendants to be

5

unrealistic, fanciful and impossible to attain.  The Individual Defendants made the unrealistic

projections on revenue and other financial performance for the purpose of inducing NetJapan to

invest substantial sums into the new entity, i.e., STC.

20.    On August 28, 2004, Defendant J. Shreeve caused an "intellectual property

disclosure" to be made to NJH and NetJapan.  This disclosure made no reference to the written

obligations of some of the Individual Defendants to PowerQuest precluding their competition

with PowerQuest/Symantec even though these obligations could limit and impair STC's ability

to release software products.  In addition, the disclosure described their intellectual property in a

manner designed to lead NJH and NetJapan to believe incorrectly that commercially viable and

successful software and hardware products had in fact been developed by SCI and ShadowStor.

21.    On September 9, 2004, representatives of NJH and NetJapan met with the

Individual Defendants to discuss further the equity investment in STC proposed by the Individual

Defendants.  At this meeting, the Individual Defendants advised NetJapan and NJH that STC had

already been formed as of that date by the merger of SCI and ShadowStor.  At this meeting, the

Individual Defendants presented a slide show/Powerpoint presentation in order to promote the

sale of STC's shares to NetJapan and NJH.  In this presentation, the Individual Defendants

repeated the misleading and unrealistic representations about projected income described above.

In addition, the Individual Defendants stated that projected sales would increase from $1.7

million in year one to $16.7 million in year three.

6

22.    At this September 9, 2004 meeting, the Individual Defendants represented themselves as having superior knowledge with respect to (1) the market place for STC's current and planned products, and (2) the capabilities of STC to develop the products described in STC's business plan.  Indeed, STC emphasized its "50+ years of enterprise storage experience in development, product management, sales and marketing."  STC further claimed that its "engineering team [was] in place for 5+ years," that it had a "wealth of raw and productized technology" comprised of five existing commercial products, three products currently being evaluated by customers and a "reputation of quality."  STC and the Individual Defendants made these representations so that NJH and NetJapan would believe that STC and the Individual Defendants had specialized knowledge in the area of storage/back-up software superior to the knowledge of NJH and NetJapan.

23.    On October 21, 2004, STC entered into a written Stock Purchase Agreement with NJH and NetJapan (the "Stock Purchase Agreement").  A true and correct copy of this Stock Purchase Agreement is attached hereto as Exhibit "2" and incorporated herein as if set forth in full.  The parties attached as Exhibit "D" to the Stock Purchase Agreement copies of some of the materials provided to NJH and NetJapan prior to entering into the Stock Purchase Agreement which contained, *inter alia*, the representations referenced in paragraphs 18, 20, 21 and 22 of this Complaint.  With respect to Exhibit "D," the Individual Defendants caused STC to represent to NJH as follows:

7

2.13 **STC's Business Plan.** STC has provided NJH with a Business Plan stating STC's intended plan of operation and estimated results of operations. The elements of and the representations included in this Business Plan have been prepared by STC on a "good faith" basis and are based on the reasonable expectations of STC and its officers. . . . The Business Plan consists of a number of separate documents, all of which were presented to NJH prior to the Utah meeting of NJH and STC officers on September 9 and 10, 2004 or were provided in such meetings. All of these documents are included in Exhibit "D" of this Agreement. "

24.    The Individual Defendants caused STC to make the following representations to

NJH in the Stock Purchase Agreement:

2.14 **Financial Statements.** STC was formed as a Utah corporation on September 7, 2004 and has a very limited operating history. The financial statements of STC included in STC's Business Plan are prepared in accordance with the books and records of STC, which have been maintained in accordance with good business practice and fairly present the financial position of STC. STC does not have any contingent obligations, liability for taxes or other outstanding obligations that are material in the aggregate, except as disclosed in its unaudited financial statement.

25.    The Individual Defendants caused STC to make the following additional

representations:

2.15 **No Material Misrepresentation by STC.** Neither this Agreement nor any document or instrument furnished to NJH by STC, when taken in conjunction with any supplemental or revised information furnished to NJH in writing prior to the date hereof, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements in such documents, instruments or other information provided, in light of the circumstances in which they were made, not misleading. However,

8

with respect to any projected financial information, STC represents
that it was prepared in good faith and that STC reasonably believes
that the assumptions made in preparing such projections were
reasonable as of the date of such projections.

26.     The representations of STC in Sections 2.13, 2.14 and 2.15 of the Stock Purchase

Agreement were made to induce NJH to enter into the Stock Purchase Agreement. NJH

reasonably relied upon those representations in entering into the Stock Purchase Agreement.

27.     On or about November 12, 2004, James Kirby and Hanna Kirby (the "Kirbys") –

the former principals of SCI – resigned as officers, directors and employees of STC. The Kirbys'

resignations as officers and directors of STC caused great concern to STC and the Individual

Defendants. In particular, the Individual Defendants caused STC to file a lawsuit against the

Kirbys alleging that the Kirbys had stolen confidential information and valuable trade secrets

belonging to STC. In addition, because the Kirbys terminated their employment with STC in

addition to resigning as directors and officers, STC lost software engineers necessary to develop

the product offerings described in STC's business plan provided to NJH and NetJapan prior to

the Stock Purchase Agreement.

28.     Instead of being candid with NJH and NetJapan, STC and the Individual

Defendants decided to conceal the impact of the Kirbys' resignations from NJH and NetJapan.

In particular, while STC disclosed the resignations of the Kirbys, the Individual Defendants never

advised NJH or NetJapan of (1) their concerns about the Kirbys' alleged theft of confidential

9

information and trade secrets from STC, (2) the lack of sufficient software engineers to develop

the products promised by STC, and (3) STC's lawsuit against the Kirbys. Instead, on November

16, 2004, Defendant Barnes, with the knowledge and assent of the other Individuals Defendants

and STC, represented to NJH that STC's "development team" was "stronger than ever" and that

losing the Kirbys would not affect STC's ability to fulfill its business plan. These

representations were false as STC harbored serious concerns that the departure of the Kirbys, and

the manner of those departures, would irreparably injure STC's business. Indeed, three days after

this communication to NJH, STC filed a lawsuit against the Kirbys claiming that (1) the Kirbys

misappropriated trade secrets of STC and (2) the Kirbys had intentionally breached their

fiduciary duties to STC.

     29.    The misrepresentations about the effect on STC of the Kirbys' departures and the

non-disclosure of STC's anticipated lawsuit against the Kirbys (and the allegations related

thereto) were made intentionally in order to induce NJH to fund $650,000.00 as provided in

Section 1.2 of the Stock Purchase Agreement.

     30.    NJH did not learn that STC and the Kirbys were involved in litigation until the

Kirbys approached NJH in September 2005 seeking to sell all of their STC shares of stock to

NJH.

31.    In September 2005, NJH agreed to purchase all of the Kirbys' shares in STC for the sum of $550,000.00. At the time NJH agreed to purchase the Kirbys' shares, NJH and NetJapan were gravely concerned about STC's release of software products as promised by STC. In particular, STC had made a number of commitments to release software products on dates certain so that NetJapan could distribute those software products to its customers in Japan. STC did not fulfill these commitments. Based on information and belief, STC did not fulfill these commitments because it had inadequate support of software engineers to develop the software products promised to NetJapan.

32.    Following NJH's purchase of the Kirbys' shares, STC sought loan financing from NetJapan. In particular, STC advised NJH and NetJapan that the reason why STC was unable to fulfill its commitments to release software products was due to the lack of financing and that if NJH or NetJapan were able to provide additional financing, STC would be able to timely deliver software products sought by NetJapan.

33.    On October 21, 2005, STC and NetJapan entered into a written "Advanced Royalties Agreement," a true and correct copy of which is attached hereto as Exhibit "3." The Individual Defendants caused STC to represent to NetJapan in the Advanced Royalties Agreement that STC would release ShadowProtect Server Edition and ShadowProtect Desktop Edition on October 31, 2005, so that NetJapan could distribute those products in Japan

11

commencing in November 2005. STC and the Individual Defendants knew when they made the promise to release those software products within ten (10) days of the agreement that STC had no intent or ability to fulfill that promise. Indeed, STC did not release these software products until April 24, 2006 (and, then, in a form which could not be localized for NetJapan's business purposes).

34. STC and the Individual Defendants knowingly and fraudulently represented that STC would release the software products on October 31, 2005 in English for purposes of inducing NetJapan to loan $300,000.00 to STC. STC was fully aware of NetJapan's commitments to its own customers and, in fact, the Advanced Royalties Agreement recites that the release date of October 31, 2005 was "critical to the success of [NetJapan's] planned release of a localized version in November 2005."

35. Furthermore, STC represented that it would use the funds loaned by NetJapan for the purposes of completing the software products sought by NetJapan. In order to further induce NetJapan to enter into the Advanced Royalties Agreement, STC represented that the funds would be repaid "on or before December 31, 2006" by a portion of the royalties otherwise due to STC on NetJapan's sales of software products developed by STC (pursuant to the Master Distributor Agreement).

12

36.    When STC entered into the Advanced Royalties Agreement, it had no intention to use the loan proceeds from NetJapan for the purposes stated in the Advanced Royalties Agreement. Instead, STC intended to use those funds, and did use those funds, for purposes of (1) making salary payments to the Individual Defendants (only one of whom is a software engineer) and (2) developing other software products for customers other than NetJapan and for products which STC knew NetJapan did not want to sell in Japan.

37.    In January 2006, Defendant J. Shreeve asked NetJapan to advance an additional $150,000.00 pursuant to Section 1(b) of the Advanced Royalties Agreement, even though the requirements for the payment had not been satisfied by STC. In order to secure this additional payment for STC, Defendant J. Shreeve represented to NetJapan on January 25, 2006, that STC had worked "with great effort and diligence" toward developing the software products sought by NetJapan. STC represented that the software products were "nearing completion." These representations were false. Based on information and belief, STC used the funds advanced by NetJapan in October 2005 for purposes other than developing the software products promised to NetJapan and STC was not close to releasing the software products sought by NetJapan. Reasonably relying upon STC's and Defendant J. Shreeve's misrepresentations, NetJapan advanced an additional $150,000.00 to STC.

13

38.    On April 24, 2006, STC released the ShadowProtect Server Edition and the ShadowProtect Desktop Edition in English.  Notwithstanding the official release of the software products, the products were extremely defective.  Later, on June 30, 2006, STC finally released subsequent versions of ShadowProtect Server Edition and ShadowProtect Desktop Edition in a form sufficient to permit NetJapan to localize the software.  Even with respect to the June 30, 2006 version of ShadowProtect Desktop Edition, it was not a product suitable for personal use, i.e., the primary use for which NetJapan sought a desktop version.  When NetJapan questioned STC as to when a personal edition would be released, STC claimed that it would be released in August 2006.

39.    STC's ShadowProtect Server Edition and ShadowProtect Desktop Edition were, in fact, defective.  So that NetJapan would not lose market share attendant to further delay in obtaining a useable software product, NetJapan caused its own engineers to modify the software product to remedy the defects and to allow use by NetJapan's Japanese customers.

40.    In October 2006, STC had still not released a personal use version of ShadowProtect Desktop Edition.  NetJapan then requested that STC establish a time table for the release of ShadowProtect Desktop Edition for personal use.  STC responded that it had decided not to proceed with the release of such a software product and instead would devote its attention to other products.

14

41.    In November 2006, NJH exercised its right to appoint a director of STC, Mr.

David Crocker.  Mr. Crocker was denied access to STC's financial records and other information

and subsequently resigned from the board of directors.

### FIRST CLAIM FOR RELIEF
#### (Fraud – Against STC and the Individual Defendants)

42.    By this reference, NJH incorporates all preceding paragraphs of this Complaint as

if set forth in full herein.

43.    The Individual Defendants caused STC to make the representations alleged in

paragraphs 23, 24 and 25 of the Complaint to NJH in the Stock Purchase Agreement.  At the time

that the Individual Defendants caused STC to make these representations, STC and the

Individual Defendants knew the representations were false or made the representations with

reckless disregard of the truth or falsity of the representations.  In particular, STC and the

Individual Defendants knew that the financial projections attached as Exhibit "D" to the Stock

Purchase Agreement were not reasonable nor made in good faith but were instead fanciful and

unrealistic projections made in order to induce NJH to make a substantial cash investment in

STC.  With respect to the financial statements of STC, STC was formed by the merger of SCI

and ShadowStor; as part of that merger, STC obtained the financial statements of SCI and

ShadowStor which financial statements reflected important and material information about past

performance of software products which were the subject of STC's projections and

15

representations in its Business Plan and which financial statements reveal that the assumptions

and projections reflected in STC's Business Plan were fanciful and unrealistic. Likewise, STC

and the Individual Defendants knew that Defendants R. Shreeve, Nordquist, Barnes and Scott

were under written obligations not to compete with Symantec and that those obligations would

affect STC's ability to release software products which were the subject of the financial

projections provided to NJH.

44.     The Individual Defendants had specific economic motivations to induce NetJapan

to enter into the Stock Purchase Agreement. ShadowStor was not a successful company and

lacked sufficient income to pay salaries sought by the Individual Defendants. (Notably, the

Individual Defendants never disclosed the poor financial performance of ShadowStor to NJH.)

The merger of ShadowStor and SCI, and the formation of STC, did not result in the generation of

revenue sufficient to pay salaries and wages to STC's employees, including the Individual

Defendants. Instead, the only plausible source of funding to pay salaries to the Individual

Defendants was NJH through its share purchase. Due to the personal desire to receive (generous)

salaries from their employment with STC, the Individual Defendants caused STC to make the

misrepresentations in the Stock Purchase Agreement.

45.     The materiality of the above-described misrepresentations and non-disclosure of

material facts was known by the Individual Defendants. Indeed, James Kirby requested that

16

Defendant J. Shreeve disclose fully to NJH the internal financial and business issues confronting STC because it would "not be fair" to NJH and NetJapan otherwise. The Individual Defendants ignored this request.

46.    NJH detrimentally and reasonably relied upon the representations made by STC in the Stock Purchase Agreement. The Individual Defendants and STC represented themselves as having superior knowledge about the matters attached as Exhibit "D" to the Stock Purchase Agreement. If NJH had been told the truth about the nature of STC's financial projections, if NJH had been provided past financial statements from SCI and ShadowStor and/or if NJH had been advised of the competitive restrictions under which STC was operating, NJH would not have entered into the Stock Purchase Agreement.

47.    STC and the Individual Defendants knew that the representation (and omissions) concerning the effect of the departures of the Kirbys on STC's business alleged in paragraph 28 of the Complaint was false and misleading. In particular, STC and the Individual Defendants knew that the departure of key software engineers for STC would impair STC's ability to develop commercially viable software products, that the Individual Defendants harbored a belief that the Kirbys had misappropriated confidential information and trade secrets belonging to STC and that STC intended to file a lawsuit against the Kirbys for misappropriation of confidential information and trade secrets.

17

48.     The misrepresentations (and omissions) about the Kirbys' departures were made in order to induce NJH to pay $650,000.00 pursuant to Section 1.2(b) of the Stock Purchase Agreement. NJH detrimentally and reasonably relied upon the representations of STC and in fact paid the amounts set forth under Section 1.2(b) of the Stock Purchase Agreement. If NJH had known the true state of facts concerning the departures of the Kirbys, NJH would not have paid $650,000.00 pursuant to the terms of the Stock Purchase Agreement without adequate assurances that STC could fulfill its obligations pursuant to Section 1.13 to discharge STC's Business Plan notwithstanding the departure of the Kirbys.

49.     Notwithstanding the shareholdings of shareholders other than the Individual Defendants, the Individual Defendants have exercised complete control of STC since its formation. The misrepresentations described above were made on behalf of STC and were made with the knowledge and agreement of the Individual Defendants, and each of them.

50.     NJH has been damaged by the intentional misrepresentations and omissions of material fact made by STC and the Individual Defendants in an amount to be proven at trial.

51.     The above-described acts and omissions of STC and the Individual Defendants were a result of willful and malicious conduct, or conduct that manifested a knowing and reckless indifference toward, and a disregard of, the rights of others, including NJH.

18

Accordingly, NJH seeks an award of punitive damages against STC and the Individual

Defendants.

### SECOND CLAIM FOR RELIEF
**(Negligent Misrepresentation – Against STC and the Individual Defendants)**

52.     By this reference, NJH incorporates all preceding paragraphs of this Complaint as

if set forth in full herein.  This claim for relief is pled in the alternative to the First Claim for

Relief set forth above.

53.     With respect to the representations alleged in paragraphs 23, 24 and 25 of this

Complaint to NJH in the Stock Purchase Agreement, STC and the Individual Defendants owed a

duty to NJH to make such representations only after a thoughtful and considerate review of the

information made available to STC and the Individual Defendants.  Indeed, STC and the

Individual Defendants represented to NJH that STC and the Individual Defendants had particular

skill, knowledge and ability concerning (1) the development, marketing and sale of storage

software and (2) the business operations and history of STC.

54.     In making the representations alleged in paragraphs 23, 24 and 25 of the

Complaint, STC and the Individual Defendants breached their duty of care to NJH.  In particular,

STC and the Individual Defendants made the fanciful and unrealistic representations without due

inquiry into the accuracy of those representations and the feasibility of NJH's ability to fulfill the

schedule for releasing software and to meet the revenue projections.

55.     The Individual Defendants made the representations alleged in paragraphs 23, 24 and 25 of this Complaint for the purpose of inducing NJH to enter into the Stock Purchase Agreement.

56.     NJH reasonably and detrimentally relied upon the representations made to it by STC and the Individual Defendants.

57.     NJH has been damaged by the negligent misrepresentations made by STC and the Individual Defendants in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
### (Fraud – Against STC and the Individual Defendants)

58.     By this reference, NetJapan incorporates all preceding paragraphs of this Complaint as if set forth in full herein.

59.     STC, under the control and direction of the Individual Defendants, made the representations to NetJapan set forth in paragraphs 33 and 35 of this Complaint. At the time those representations were made, STC and the Individual Defendants had no ability – let alone intent – to fulfill their promise to release ShadowProtect Server Edition and ShadowProtect Desktop Edition within ten days, i.e., on October 31, 2005. Instead, STC and the Individual Defendants knew that they were incapable of releasing those software products by October 31, 2005. Alternatively, the Individual Defendants caused STC to make the representation with

20

reckless disregard to the truth or falsity of STC's ability to release the software products by October 31, 2005.

60.    STC and the Individual Defendants made the representations set forth in paragraphs 33 and 35 of the Complaint for the purposes of inducing NetJapan to enter into the Advanced Royalties Agreement and so that NetJapan would agree to loan STC $300,000.00 pursuant to the terms of the Advanced Royalties Agreement.

61.    NetJapan detrimentally and reasonably relied upon STC's and the Individual Defendants' representations set forth in paragraphs 33 and 35 of this Complaint.  In particular, if NetJapan had known that STC and the Individual Defendants lacked the intent and the ability to release the software products on October 31, 2005, NetJapan would not have entered into the Advanced Royalties Agreement and would not have funded the initial loan payment of $150,000.00 in October 2005.

62.    The representation made by Defendant J. Shreeves to NetJapan as alleged in paragraph 37 of the Complaint was made in his capacity as an officer of STC and was made with the knowledge and consent of the other Individual Defendants.  This representation was made in order to induce NetJapan to advance $150,000.00 pursuant to Section 1(b) of the Advanced Royalties Agreement even though STC had not released the software products on October 31, 2005.

21

63.    STC and the Individual Defendants knew that the representation alleged in paragraph 37 of the Complaint was false and/or that the representation was made with reckless disregard for its truth or falsity.  Based on information and belief, the Individual Defendants and STC knew that STC's release of the software products was not imminent and that STC's personnel had not been working on the software products "with great effort and diligence."

64.    NetJapan detrimentally and reasonably relied upon the representation alleged in paragraph 37 of this Complaint.  In particular, if NetJapan had known that STC had failed to expend adequate resources of the software products in order to cause their timely release, NetJapan would not have advanced $150,000.00 pursuant to Section 1(b) of the Advanced Royalties Agreement in January 2006.

65.    NetJapan has been damaged by the fraudulent misrepresentations alleged above in an amount to be proven at trial.

66.    The above-described acts and omissions of STC and the Individual Defendants were a result of wilful and malicious conduct, or conduct that manifested a knowing and reckless indifference toward, and a disregard of, the rights of others, including NetJapan.  Accordingly, NetJapan seeks an award of punitive damages against STC and the Individual Defendants.

//

//

22

**FOURTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation – Against STC and the Individual Defendants)**

67.    By this reference, NetJapan incorporates all preceding paragraphs of this Complaint as if set forth in full herein. This claim for relief is pled in the alternative to the Third Claim for Relief set forth above.

68.    With respect to the representations alleged in paragraphs 33, 35 and 37 of this Complaint to NetJapan and the Stock Purchase Agreement, STC and the Individual Defendants owed a duty to NetJapan to make representations about the release of the software products only after a thoughtful and considerate review of the information made available to STC and the Individual Defendants. Indeed, STC and the Individual Defendants represented to NetJapan that STC and the Individual Defendants had particular skill, knowledge and ability concerning the development, marketing and sale of storage software.

69.    In making the representations alleged in paragraphs 33, 35 and 37 of the Complaint, STC and the Individual Defendants breached their duty of care to NetJapan. In particular, STC and the Individual Defendants made representation without due inquiry into the status of the development of the software and into a reasonable date for releasing software.

70.    The Individual Defendants made the representations alleged in paragraphs 33, 35 and 37 of this Complaint for the purpose of inducing NetJapan to loan funds to STC pursuant to the Advanced Royalties Agreement.

23

71.    NetJapan reasonably and detrimentally relied upon those representations.

72.    NetJapan has been damaged by the negligent misrepresentations made by STC and the Individual Defendants in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**(Breach of the Stock Purchase Agreement – Against STC)**

73.    By this reference, NJH and NetJapan incorporate all preceding paragraphs of this Complaint as if set forth in full herein.

74.    STC has breached the terms of the Stock Purchase Agreement.

75.    NJH has materially performed all of its obligations under the Stock Purchase Agreement.

76.    NetJapan was an intended third-party beneficiary of the Stock Purchase Agreement.

77.    As a proximate result of STC's breaches of the Stock Purchase Agreement, NJH and NetJapan have suffered damages, including consequential and incidental damages, in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
**(Breach of the Master Distributor Agreement – Against STC and the Individual Defendants)**

78.    By this reference, NetJapan incorporates all preceding paragraphs of this Complaint as if set forth in full herein.

24

79.     STC has materially breached the Master Distributor Agreement.

80.     NetJapan has substantially performed all of its obligations under the Master Distributor Agreement.

81.     As a direct and proximate result of STC's breaches of the Master Distributor Agreement, NetJapan has suffered damages, including incidental and consequential damages, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment – Against STC)

82.     By this reference, NJH incorporates all preceding paragraphs of this Complaint as if set forth in full herein.

83.     Concurrent with the Advanced Royalties Agreement and on October 21, 2005, STC and NJH entered into a second Stock Purchase Agreement (the "Second Stock Purchase Agreement"), a true and correct copy of which is attached hereto as Exhibit "4."

84.     On or about December 5, 2006, STC attempted to exercise its rights pursuant to Section 1.2 of the Second Stock Purchase Agreement. In response to STC's notice of exercise to exercise the option pursuant to Section 1.3 of the Second Stock Purchase Agreement, NJH objected to the exercise on the basis that such a proposed purchase would be an illegal distribution under Utah Code Section 16-10(a)-640.

85.     There is presently existing a good faith dispute as to whether STC has any current right to purchase STC shares of common stock pursuant to Section 1.3 of the Second Stock Purchase Agreement.  In particular, NJH alleges, and STC denies that because STC's liabilities substantially exceed its assets, STC cannot legally purchase STC shares of common stock.

86.     Accordingly, NJH requests a declaratory judgment that STC's December 5, 2006, notice to exercise its option under Section 1.2 of the Second Stock Purchase Agreement would result in a transaction barred under Utah law and, thus, NJH may disregard said notice.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     As to the First Claim for Relief, for damages against STC and the Individual Defendants in an amount to be proven at trial and for punitive damages against said Defendants;

2.     As to the Second Claim for Relief, for damages against STC and the Individual Defendants in an amount to be proven at trial.

3.     As to the Third Claim for Relief, for damages against STC and the Individual Defendants in an amount to be proven at trial and for punitive damages against said Defendants;

4.     As to the Fourth Claim for Relief, for damages against STC and the Individual Defendants in an amount to be proven at trial;

5.  As to the Fifth Claim for Relief:

   a.  For damages in an amount to be proven at trial; and

   b.  For attorneys' fees incurred herein;

6.  As to the Sixth Claim for Relief:

   a.  For judgment against STC in an amount to be proven at trial; and

   b.  For attorneys' fees incurred herein;

7.  As to the Seventh Claim for Relief, NJH prays for declaratory judgment that STC

is currently unable to exercise its rights under Section 1.2 of the Second Stock Purchase

Agreement; and

//

//

//

//

//

//

//

//

//

27



8.     As to all claims for relief, Plaintiffs pray for:

    a.     Costs of suit incurred herein; and

    b.     For such other and further relief as may be just and proper.

DATED this _14th_ day of December, 2006.

                        BURBIDGE & MITCHELL

                        Robert J. Shelby
                        Attorneys for Plaintiffs NetJapan Holdings, Inc.,
                        and NetJapan, Inc.

Plaintiff's address:

Asendo Kanda-kon'yancho Building
8 Kanda-kon'yacho
Chiyado-ku, Tokyo,
101-0035 Japan

28

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury on all issues that may be tried to a jury.

DATED this _14th_ day of December, 2006.

BURBIDGE & MITCHELL

_[signature]_

Robert J. Shelby
Attorneys for Plaintiffs NetJapan Holdings, Inc.,
and NetJapan, Inc.

P:\DSchanuel\DSchanuel\DSchanuel\MyFiles\NetJapan\Pleadings\Complaintv2.wpd

29

# EXHIBIT B

**FILED DISTRICT COURT**
Third Judicial District

MAR 0 7 2007

SALT LAKE COUNTY
By_____
Deputy Clerk

Richard D. Burbidge (#0492)
Jefferson W. Gross (#8339)
Robert J. Shelby (#8319)
BURBIDGE MITCHELL & GROSS
215 South State Street, Suite 920
Salt Lake City, Utah 84111
Telephone: (801) 355-6677
Facsimile: (801) 355-2341

Attorneys for Plaintiff

## IN THE THIRD DISTRICT COURT IN AND FOR

## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| NETJAPAN HOLDINGS, INC., et al., <br><br> Plaintiffs, <br><br> vs. <br><br> STORAGECRAFT TECHNOLOGY CORPORATION, et al., <br><br> DefendantS. | **STIPULATED PROTECTIVE ORDER** <br><br> Case No. 060920091 <br><br> Judge Vernice Trease |

Plaintiffs NetJapan Holdings, Inc. and NetJapan, Inc, (collectively "Plaintiffs") and

Defendants StorageCraft Technology Corporation, Thomas J. Shreeve, Thomas R. Shreeve,

Scott A. Barnes, Curtis A. James and Brandon Nordquist (collectively "Defendants") jointly

stipulate to entry by the Court of a Protective Order as set forth below pursuant to Rule 26(c) of

the Utah Rules of Civil Procedure.

431878.3

Based on the stipulation of the Plaintiffs and Defendants (individually a "Party" and collectively the "Parties") to entry of the following Protective Order pursuant to Rule 26(c), Utah Rule of Civil Procedure, and for good cause shown,

IT IS HEREBY ORDERED THAT:

1.      Any document, or portion thereof, and any other form of evidence or discovery contemplated under Rules 26 through 36 of the Utah Rules of Civil Procedure may be designated by a Party as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* in accordance with the provisions of this Protective Order. "Confidential Information" as used in this Protective Order refers to documents, things, and information designated as either "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." By designating a document as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL", a Party represents that it has made a bona fide, good faith determination that the information is, in fact, entitled to the designation given it.

2.      Documents, things, and information may properly be marked as *"CONFIDENTIAL"* under this Protective Order if a Party reasonably and in good faith believes that it contains trade secrets and other confidential information that the disclosing Party in good faith believes is not publicly known that would be valuable to third parties, including but not limited to the disclosing Party's actual or potential competitors, and that the disclosing Party would not normally reveal, and has not revealed, to third parties without an agreement to maintain it in confidence.

3.      The following documents, things, and information may properly be marked as *"HIGHLY CONFIDENTIAL"* under this Protective Order: Confidential Information the disclosure of which to directors, officers, and employees of the adverse party is reasonably foreseeable to cause the disclosing party competitive injury through its advertent or inadvertent

use, and for which treatment of the information as CONFIDENTIAL is insufficient to protect against that competitive injury. In no event shall a party designate as "HIGHLY CONFIDENTIAL" information that the producing Party does not itself treat as highly confidential in the usual course of its business. The parties acknowledge and agree that the designation of information as "HIGHLY CONFIDENTIAL" can make litigation more difficult, costly, and time consuming and therefore this designation shall be used as sparingly as possible.

4. Confidential Information must be designated as follows:

(a) Documents or copies provided to another Party in response to discovery requests containing Confidential Information may be designated by any Party, or by any third party who produces documents or information in response to a subpoena or otherwise, as either *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* by marking the page or the pages on which the Confidential Information appears with the legend *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL."* Electronic information shall likewise bear such designation on the CD or other physical medium on which the electronic information is found.

(b) In lieu of marking the original of a document which contains Confidential Information prior to inspection, a Party may orally designate documents being produced for inspection as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* thereby making them subject to this Order. However, copies of such documents ultimately produced must be marked *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* at the time any such documents are supplied to inspecting counsel in order to make such copies subject to this Order.

(c)     Confidential Information disclosed at a deposition, whether by testimony or use of a document or thing, may be designated as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* by clearly indicating on the record at the deposition the specific testimony containing Confidential Information that is to be made subject to the provisions of this Order. Documents, things, or information not designated on the record of the deposition as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* may thereafter be designated as such by notifying the other party in writing within seven (7) days of the receipt of the transcript of such deposition. During that seven (7) day period, the deposition transcript and any associated documents, things, and information shall be treated as HIGHLY CONFIDENTIAL. If a designation is made, each Party shall attach an appropriate notification to the face of the deposition transcript and each copy thereof in its possession, custody or control

(d)     Confidential Information contained in responses to interrogatories, other discovery requests or responses, affidavits, briefs, memoranda or other papers filed with the Court, may be designated by prominently marking the cover, first page, or any page or pages of such documents containing Confidential Information with the legend *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL."* Copies of such items filed with the Court shall be maintained under seal pursuant to the provisions of Paragraph 9 hereof.

(e)     Tangible objects constituting or containing Confidential Information may be designated by affixing to the object or its container a label or tag marked *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL."*

(f)     Notwithstanding any other provisions of the Order, any Party may designate as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* any testimony of

and/or documents produced by that Party's agent, sales representative, or technical or business consultant, or by any third party who produces documents or information in response to a subpoena or otherwise.

      (g)     Should any person or entity with access to documents, things or information designated as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* make copies, extracts, summaries, descriptions, projections and/or extrapolations of or from the documents, things or information designated as *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* or any portions thereof, such copies, extracts, summaries, descriptions, projections and/or extrapolations shall be stamped *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* consistent with the original information and treated as Confidential Information pursuant to the provisions of this Stipulated Protective Order.

      5.     Confidential Information shall be used only for purposes of this litigation and not for any other purpose or function, including without limitation any business, patent prosecution, competitive or governmental purpose or function, and shall be disclosed and made available only to the following:

      (a)     "Outside Trial Counsel" of record and employees of such attorneys to whom it is necessary that the material be shown for purposes of this litigation; court reporters and videographers receiving or transcribing the documents, things or information in connection with official reporting (for example, at a deposition or a hearing); the Court and Court staff; outside photocopy, imaging, database, graphics, design, computer simulation modeling, exhibit production services, to the extent necessary to assist such Outside Trial Counsel for purposes of this litigation.

(b)     Experts and consultants (including translators) retained or employed by a Party's attorney solely for the purpose assisting in the preparation of this litigation for trial and who are not currently employed by any of the Parties. Provided, however, that such retained or employed experts and consultants agree not to use the Confidential Information for any purpose other than assisting in the preparation of this matter for trial. Counsel for the party intending to disclose Confidential Information to an expert or consultant shall first inquire whether that expert or consultant is currently affiliated with, employed by, or consulting with a competitor of the producing Party. If so, the party intending to make such disclosures shall also give written notice of the following to the producing Party, within 14 days prior to such intended disclosure: the identity of the competitor, the affiliation of the expert or consultant with the competitor and the specific nature of the work that such expert or consultant is performing for the competitor.

(c)     Documents and information designated *"HIGHLY CONFIDENTIAL,"* may not be disclosed to any officer, director, shareholder, or employee of the receiving Party, unless the Party producing the "HIGHLY CONFIDENTIAL" information agrees in writing to allow such access or the Court orders such access.

(d)     Documents and information designated *"CONFIDENTIAL,"* may be disclosed to a Party and to officers, directors, shareholders, or employees of a Party with whom it is necessary to consult regarding this litigation, provided such persons sign an acknowledgement in the form of Exhibit A hereto. Upon written request, counsel will provide copies of the acknowledgement signed by such persons.

(e)     Any person in Subsection (b) above prior to receiving Confidential Information shall sign an acknowledgement in the form of Exhibit A attached hereto and

shall be subject to this Stipulated Protective Order. A willful violation of any material term of this Stipulated Protective Order by any such individual may be punishable as contempt of court.

(f)    A witness in the above-captioned case not otherwise authorized to view Confidential Information in question during that witnesses testimony at a deposition, hearing, or trial in the above-captioned case, provided that: (1) the disclosure is made solely for the purpose of directly advancing the questioning party's claims or defenses, and for no other purposes whatsoever; (2) the witness is not permitted to retain the Confidential Information after the witness is examined regarding the Confidential Information; and (3) the witness is explicitly informed that this Protective Order forbids him or her to disclose the Confidential Information except as permitted under the Protective Order and that he or she is subject to the Court's jurisdiction for purposes of enforcing this Protective Order. A deposition witness may review the entire deposition transcript and exhibits thereto in order to review and sign pursuant to Utah Rule of Civil Procedure 30(e); however, the disclosing Party may object to the deponent further reviewing Confidential Information marked as a deposition exhibit. If an objection is made, either Party may seek relief from the Court and the witness shall not be permitted to review the Confidential Information until the Court has ruled or disclosing Party withdraws its objection.

6.    If the Party to whom *"CONFIDENTIAL"* or *"HIGHLY CONFIDENTIAL"* documents, things or information has been produced believes that any of the documents, things or information has been improperly designated, the receiving Party may at any time request the Party which made the designation to cancel or change the designation with respect to any

documents, things or information and to agree that thereafter such document, thing or

information will no longer be subject to certain or all of the provisions of this Stipulated

Protective Order. Such request shall be in writing and shall particularly identify the information

that is contested, including the reasons supporting the contentions. If the Party which produced

the documents, things, or information objects to the requested declassification, it must, within 14

days of its receipt of the request to declassify, file and serve a motion for a protective order

supporting its classification. The Party making the designation shall have the burden of

establishing that the particular document, thing, or information is properly classified as

"CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" and that such classification is necessary to

protect against a reasonably foreseeable risk of harm that would be caused by the failure to treat

the information as designated. If no such motion is timely filed, the Party objecting to the

designation shall be entitled to treat the documents and/or information in accordance with the

written request of such Party.

      7.     No copies of documents, things or information designated as Confidential

Information shall be received, kept, or maintained by persons other than those authorized to do

so under this Protective Order. All persons to whom Confidential Information is disclosed shall

use the same care and discretion to avoid disclosure of the Confidential Information as the

receiving Party uses with its own similar information that it does not wish to disclose to prevent

the unauthorized or inadvertent disclosure of any information designated as Confidential

Information.

      8.     When a Party gives notice to another Party that, during an oral deposition,

"*CONFIDENTIAL*" or "*HIGHLY CONFIDENTIAL*" documents, things or information are

expected to be produced, used or discussed during the deposition, then only persons authorized

to receive such information pursuant to this Protective Order will be allowed to attend that portion of the deposition on behalf of the receiving Party.

9.      To the extent it is necessary to file with the Court any material containing or referring to any Confidential Information, the Parties shall comply with the applicable rules for filing such documents under seal with the Court.

10.     Each Party's production of any Confidential Information shall be solely for purposes of and use in this action, and those documents, things and information shall not be used for any other purpose or in any other action.  If any such document(s), thing(s), or information properly becomes a matter of public record without an order of Court causing the same to be retained under seal or retained in an otherwise confidential manner, then the Parties will have the same rights to utilize the document, things, or information as the public at large under the First Amendment.

11.     Within sixty (60) days after the conclusion of this action and any appeal taken herefrom, all documents, things, and other materials produced or designated as containing Confidential Information, and all reproductions thereof, shall be returned to the Party who produced them.  Any Party may, at their option, destroy annotated copies or summaries of Confidential Information in lieu of returning those copies and summaries to the producing Party. Notwithstanding the foregoing, outside counsel for the parties shall be permitted to retain one copy of (a) materials created during the course of the lawsuit, including attorney annotations and other work product; (b) work product of testifying or non-testifying consultants/experts; (c) materials made a part of the Court record, or which have been filed under seal with the Court; (d) all depositions and Court transcripts, including exhibits; and (e) summaries of depositions.  Such

431878.3                                    9

file copies shall be maintained only by outside counsel subject to the terms of this Protective Order.

12.    Notwithstanding the termination of this action, persons who have had access to Confidential Information shall remain subject to the terms of this Stipulated Protective Order.

13.    This Stipulated Protective Order may be modified by written agreement of the parties or by further order of the Court. Each Party shall also have the right to petition the Court to modify this Stipulated Protective Order or for additional protection under Utah R.Civ.P.26(c).

**ENTERED** this 7th day of _March_, 2007.

THE HONORABLE VERNICE TREASE
THIRD DISTRICT COURT JUDGE

Agreed to and Accepted by:

By: _____

SNELL & WILMER, LLP
Todd M. Shaughnessy

*Attorneys for Defendants*


By: _____

BURBIDGE MITCHELL & GROSS
Jefferson W. Gross
*Attorneys for Plaintiffs*

**EXHIBIT A**

IN THE THIRD DISTRICT COURT IN AND FOR

SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| NETJAPAN HOLDINGS, INC., et al.,<br><br>          Plaintiffs,<br><br>     vs.<br><br>STORAGECRAFT TECHNOLOGY<br>CORPORATION, et al,<br><br>          Defendants. | **AGREEMENT TO BE BOUND BY THE<br>STIPULATED PROTECTIVE ORDER**<br><br>Case No. 060920091<br><br>Judge Vernice Trease |

        This is to certify that I have read and understand the Stipulated Protective Order (the "Order") entered in the above-captioned action and agree:  (a) to be bound by the terms and conditions set forth in the Order; (b) not to reveal to anyone, other than another persons listed in paragraph 5 of the Order, any documents, things or information designated under the Order as "*Confidential*"; (c) not to reveal to anyone, other than another persons identified in paragraph 5 of the Order, any documents, things or information designated under the Order as "*Highly Confidential*" and (d) to utilize such documents, things and information solely for purposes of and in connection with the above-captioned action.  In addition, I hereby consent to the jurisdiction of the above-identified Court for purposes of enforcing the Order.  I agree that a willful violation of any material term of the Order may be punishable as contempt of court.

Dated:  _____          _____

                                        Signature

                                        _____

                                        Printed Name

431878.3                                11